JUSTICE TRIEWEILER
dissenting.
¶21 I dissent from the majority Opinion. I would reverse the judgment of the Workers’ Compensation Court.
¶22 The result in this case is unconscionable and far from compelled by even the blindest adherence to the law.
¶23 The important facts are without dispute. Edna Hanks was a sixty-five year old widow working as a home care aid in 2001 when she developed symptoms of low back disease. She had been employed as a home care aid by Partners in Home Care, Inc., for five and a half years. She continued to work in that occupation, in spite of her age, because the social security benefits to which she is entitled through her deceased husband did little more than make her house payments. Without employment, she would not have been able to-feed herself or pay for her transportation.
¶24 By 2001, Edna, like most people her age, had developed considerable underlying degenerative disease in her spine. The evidence was that the degree of underlying degenerative disease would have been aggravated by the nature of employment she had engaged in for the previous five and one-half years, which included heavy lifting, bending and twisting. It was in that condition that she first experienced back symptoms while lifting a patient toward the end of January, 2001. However, she didn’t go to the doctor immediately and *270 she didn’t complain about her symptoms. That was not her nature. She first saw a physician on February 8, 2001, but was given no diagnosis by that physician which would relate her condition to her job. She continued to work and participated in a regimen of physical therapy. However, when her symptoms persisted, her treating physician limited her to light duty and referred her to a neurosurgeon. That occurred on March 27, 2001. The next day, claimant immediately advised her supervisor about her condition and the fact that it first became symptomatic during the course of her employment sometime in January.
¶25 Up until March 27, 2001, Hanks had continued to perform all of her duties, including lifting people up and out of bed and in and out of wheelchairs. She testified that when she originally experienced the back pain, she had assumed it was due to an arthritic condition since her mother had suffered from disabling arthritis.
¶26 No one questions that Edna Hanks’ condition from which she is now disabled is related to her employment. No one questions the severity of her condition nor the extent of her permanent disability. Finally, no one disputes that Hanks notified her employer that her disability is work related immediately after learning that she would need medical treatment and be unable to return to her normal employment duties. In spite of these undisputed facts, and with the blessing of this Court, Edna Hanks has been denied any compensation for her substantial medical expenses or her lifetime of disability based on catch 22 provisions in the Workers’ Compensation Act.
¶27 The Workers’ Compensation Court and this Court have concluded that Hanks’ condition could not be an occupational disease because it first became symptomatic during a single lifting incident. Yet, because she sustained an “injury” during that incident, she is not eligible for benefits because she did not notify her employer about the “injury” that she did not know she had sustained for a period of more than thirty days.
¶28 Based on the not uncommon facts in this case, I would interpret the evidence in a manner that permits recovery of benefits.
¶29 First, I disagree with the majority’s conclusion in ¶ 16 that “Hanks’ own testimony that severe pain followed the “krik” incident within a couple of days precludes the tolling of the thirty days.” Hanks actually testified as follows:
So I felt a little cringe or a little crook in my back, as I called it. And it hurt a little bit, but I thought I was just-you know, just some little thing was going on. I didn’t expect anything more than *271 that. And it stopped, and I didn’t have anymore pain. And I didn’t tell her hubby that I felt a little cringe in my back and that. I just kind of let it go after that.
Two or three days later, I-when I started to get in and out of the car, it was hard for me to get in and out of the car. And then, it quit again. And it was pain, little pains going down my right leg, not my left leg, my right leg. And I didn’t think anymore about it until, oh, it was January, February, March-towards March, I started really hurting bad at nights and that....
So, I went back to Dr. Selbach and she sent me to Dr. Beck....
So again they-I can’t remember the date of the MRI but, anyway, I had the MRI and then I went back to Dr. Beck’s. And it had to be about the 27th of March because just as soon as he told me what was wrong and he could see that it was wrecked, you know, on the MRI-it’s like an x-ray. I went right over to Partners and told them what was going on and that I couldn’t work.
¶30 There were only two witnesses in this case. Edna Hanks gave the foregoing testimony at the hearing before the Workers’ Compensation Court. Dr. Randale Sechrest testified by deposition. Hanks’ testimony as set forth above was uncontroverted. Therefore, I disagree with the majority’s conclusion that based on her own testimony, severe pain followed the “krik” incident within a couple of days which precludes the tolling of the thirty-day report period. I would apply Killebrew v. Larson Cattle Co. (1992), 254 Mont. 513, 839 P.2d 1260, to toll the thirty-day period even if it had been established that Hanks had sustained an occupational “injury” rather than an “occupational disease.”
¶31 However, I also disagree with the majority’s observation in ¶ 18 that Hanks has not offered testimony that her underlying pre-existing back disease was incidental to her work at Partners and, therefore, has not established an occupational disease.
¶32 It is true that Dr. Sechrest testified that the lifting incident in January contributed to her disability. However, Sechrest also testified that there is a relationship between the frequency of low-back problems and healthcare work because of the lifting, bending and twisting that is done over a period of time. She testified that injury to the lumbar spine occurs primarily from axial loading, flexion and twisting-all factors that are present for the healthcare worker. She testified that in addition, healthcare workers are typically lifting patients in abnormal positions where they cannot apply good body mechanics. She stated that the longer a person is a healthcare worker, *272 the more cumulative stress and strain is applied to the back.
¶33 Dr. Sechrest testified that she believed there was a direct causal connection between healthcare work and Edna’s ultimate physical condition. Most importantly, she gave the following testimony:
Q. Well, some people suffer from spinal stenosis. [A condition diagnosed in Hanks.] And I’m wondering if there’s a positive correlation between lifting, heavy lifting, awkward lifting and acceleration or development of spinal stenosis?
A. I would say intuitively there is. Intuitively, and probably in a broad sense bending, twisting, lifting would increase and accelerate the degree of, one, your risk of disc injury, risk of disc degeneration and would accelerate the condition once it occurs. Q. So, the lifting and working with patients that Edna did in the year preceding the crick were contributing factors to whatever degenerative disc disease she had, correct?
A. Yes.
Q. Are you saying that it’s not possible for you to give an opinion to discriminate between how much was pre-existing condition caused by just general heavy work and how much was caused by lifting the Alzheimer’s patient?
A. I think that would be accurate, as I understand your question.
¶34 Based on the quoted testimony from Dr. Sechrest, I would conclude that the Workers’ Compensation Court was clearly erroneous when it found that “lacking in his [Dr. Sechrest’s] testimony and report is any indication that her underlying, pre-existing back disease was in whole or in part an occupational disease.” I would conclude that the Workers’ Compensation Court was also clearly erroneous when it found that Dr. Sechrest’s testimony established that Hanks’ condition was made symptomatic by a single incident. Dr. Sechrest actually testified that she was unable to distinguish between a single incident and the nature of Hanks’ employment for purposes of determining what made Hanks’ back condition symptomatic.
¶35 Traditionally we defer to trial judges and juries in the resolution of factual disputes. However, as we have frequently noted, that deference makes no logical sense where the Workers’ Compensation Court simply reads the same deposition that we read. In that situation, we are in as good a position to evaluate the medical testimony as the trial judge. See Brown v. Ament (1988), 231 Mont. 158, 752 P.2d 171, and Shupert v. Anaconda Aluminum Co. (1985), 215 Mont. 182, 188, 696 P.2d 436, 439.
*273 ¶36 Although Dr. Sechrest was unable to distinguish between the single incident in January and the long-term nature of Hanks’ work for purposes of determining which more significantly contributed to her symptoms, I would conclude that when, as in this case, it is undisputed that her condition is work related, the uncertainty must be resolved in favor of providing workers’ compensation coverage to the injured employee. Otherwise, the public policy set forth at § 39-71-105, MCA, to provide wage supplement and medical benefits to a worker suffering from a work-related injury or disease is frustrated.
¶37 This case is just the most recent example of a trend, which began in this state in 1987, to write and interpret laws for the benefit of employers and insurers without regard to the terrible human consequences that work-related injuries and diseases have on working people. I sometimes wonder if, collectively, the citizens of this state have lost sight of the fact that injured workers are real human beings with families, frequently substantial medical expenses and bills to pay for food, housing and transportation. I am sometimes concerned that as a society we have become so self centered that no one cares.
¶38 Our case law is replete with examples of the insurance industry’s efforts to prove that a disabled worker had an “occupational disease” rather than an “injury” when it was to the insurer’s advantage to do so. Here, on the other hand, where the injury claim is arguably barred by an unreasonable and unfair procedural requirement, the insurer goes to great lengths to spin Hanks’ affliction as an “injury” rather than a disease. If anyone ever needed an example of the cold and calculated manner in which injured workers are treated and the reason why liberal sanctions and attorney fees should be awarded to claimants who have been unlawfully denied their benefits, this case is it.
¶39 The state of the workers’ compensation laws in Montana have become so unfair and one-sided that I have concluded employees would be better off if the whole system was scrapped and they were given back their common rights to sue employers who cause them injury by employer negligence. Why should employers be protected from liability for unsafe workplaces when employees get nothing in return? The assumed quid pro quo is simply no longer there.
¶40 For these reasons, I dissent from the majority Opinion. I would reverse the judgment of the Workers’ Compensation Court.